# Richmond

C. B. GODWIN, SR., ET ALS. V. BOARD OF SUPERVISORS OF
NANSEMOND COUNTY, ET ALS.

AND

E. JORDAN TAYLOR, ET ALS. V. BOARD OF SUPERVISORS OF
NANSEMOND COUNTY.

November 16, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory
and Browning, JJ.

The opinion states the case.

*James H. Corbitt,* for the plaintiffs in error.

·*C. B. Godwin, Jr.,* and *W. P. Lipscomb,* for the defend-ants in error.

HOLT, J., delivered the opinion of the court.

These proceedings by agreement consolidated and heard together, deal with the right of a board of supervisors to apply certain county funds upon a bonded indebtedness incurred in improving the roads in a particular magisterial district.

On June 28, 1932, C. B. Godwin, Sr., S. Q. Bunkley and T. H. Adams, citizens and taxpayers of Nansemond county, on behalf of themselves and other citizens of said county similarly situated, applied for a writ of mandamus and of prohibition.

They allege that they are citizens and taxpayers of magisterial districts in that county other than Sleepy Hole· Magisterial District; that under authority of an act of the· General Assembly, approved March 28, 1922 (Acts of the Assembly, 1922, ch. 513, p. 888), the· Circuit Court of Nansemond county on the 8th of October, 1926, upon the·

petition of fifty qualified voters of Sleepy Hole Magisterial District ordered an election to determine whether or not the board of supervisors should issue bonds not to exceed $110,000 for the purpose of improving its roads; that pursuant to said order an election was had on November 2, 1926, which resulted in their approval; that on the 20th of January, 1927, the board directed the present issue of bonds for the full sum, $110,000, for the purposes aforesaid, said bonds to be designated "Sleepy Hole Magisterial District Nansemond county, Virginia, road bonds," each of them to be for $1,000 of date February 15, 1927, with interest from date at the rate of four and three-quarters per cent, payable semi-annually; that they were duly issued, sold, and are still outstanding; that the board did not, as provided for in said act of March 28, 1922, when the next levy was laid in Nansemond county, impose any special tax on property in said magisterial district to provide for the payment of interest or for the establishment of a sinking fund, and has never made any such provision; that by an act of the General Assembly, approved March 31, 1932 (Acts 1932, ch. 415, p. 872), there was created and established a secondary system of State highways in Virginia not included in the State highway system in which it was said "that the boards of supervisors of the several counties shall continue to make county or district levies, as the case may be, upon all real and personal property subject to local taxation, in such county or magisterial district, and not embraced within the corporate limits of any incorporated town in such counties which maintains its own streets, and is exempt from county and district road taxes unless the citizens of such town voted on the question of issuing county or district road bonds, sufficient only to provide for the payment of any bonded or other indebtedness and for the interest contracted thereon that may be outstanding as an obligation of any county or district contracted for road purposes or for the sinking fund for the retirement of any bonded indebtedness established for county or district road pur-

poses" (section 3); that after the passage of said act the board of supervisors, under the provisions of an act of the General Assembly of 1927 (Ex. Sess.), ch. 37, p. 125, prepared a budget which included among items to be paid out of the county fund for the year ending June 30, 1933, one of $7,173.25, made up of the sum of $5,225 interest on said bonds for said year, and one of $1,948.25, which went into the sinking fund; and that at a meeting of the board on April 7, 1932, this tentative budget was adopted over the protests of citizens and taxpayers of the county not property holders in Sleepy Hole Magisterial District, the net result of which was to put a burden upon the county at large which should have been borne by that district in which the proceeds of said bond issue were expended.

The prayer of the petition was that a peremptory writ of mandamus issue requiring the board of supervisors to levy a special tax on property holders in Sleepy Hole Magisterial District to meet said payments of $5,225 and $1,948.25 and that the board be enjoined and prohibited from their payment out of general county funds.

On June 23, 1932, the board of supervisors filed its demurrer and answer. It said that when these bonds were voted for it was understood that they would be taken care of by the magisterial district's fair share of gasoline tax to be paid over to the county by the State. Attention was called to the fact that under the Act of 1922 this is written into the bonds: "These bonds are issued for road improvement in Sleepy Hole Magisterial District, but the full faith and credit of the entire county of Nansemond, Virginia, is hereby pledged for their payment." It is pointed out that there has been no default in payments on them, but that interest and sinking fund installments have been met by the district's proportion of the gasoline tax supplemented by district levies and that for this reason there has never been any occasion to levy a special tax. The court was asked to consider sections 3 and 6 of the Acts of 1932, generally known as the Byrd Road Law,

which it contends gave to the board power to do those things challenged in the petition.

It denied that the interest and sinking fund items in the budget of 1932-33 were to be paid out of a general county fund, but said that they were to be paid out of an unexpended road balance on hand as of July 31, 1932. On August 25, 1932, Godwin and his associates, by leave of court, filed an amended petition. That amended petition, to a large extent, but restates the claims already made in the petition of June 28, 1932.

The issue made by these pleadings is stated by the appellants to be:

"The 'gist' of both the original and amended petitions was that the board of supervisors should be required to levy a special tax on the property in Sleepy Hole Magisterial District for the purpose of paying the interest on, and to provide a sinking fund for the payment of, the Sleepy Hole Magisterial District road bonds, and that payment not be made otherwise."

No specific disposition was made of the demurrer, although in the taking of testimony the court said to counsel, "Argue it as though the demurrer had been sustained." To fail to pass upon a demurrer is in substance to overrule it. *East* v. *Hyde,* 112 Va. 92, 70 S. E. 508. As a matter of fact the Godwin petition and the Taylor petition necessarily presented for determination the same questions. As we have seen, they were consolidated, heard upon evidence, and determined upon the facts disclosed.

The last act providing for distribution among counties of taxes derived by the State from the sale of gasoline was approved February 21, 1930, and appears in the Acts of that year at page 41, chapter 45. It directed that thirty per cent of the revenues so derived should be appropriated primarily to maintenance of roads and bridges in the several counties and should be paid over to them for that purpose, any balance remaining to be used in the con-

struction and reconstruction of other highways and bridges.

In 1932 the plan for the control and maintenance of county roads was changed by an act of the General Assembly. See Acts of 1932, ch. 415, p. 872. Under that act, known as the Byrd Road Law, the burden theretofore borne by the counties the State took over. No part of the gasoline sales tax was afterwards given to them, but all of it was retained by the State. That act, in section 3, provides:

"The boards of supervisors of the several counties shall not make any levy in nineteen hundred and thirty-two or in any year thereafter of county or district road taxes or contract any further indebtedness for the construction, maintenance or improvement of roads, and any levy heretofore or hereafter made for the year nineteen hundred and thirty-two of county or district road taxes in any county not withdrawing from the operation of this act under section 11 thereof is hereby invalidated; provided, however, that the boards of supervisors of the several counties shall continue to make county or district levies, as the case may be, upon all real and personal property subject to local taxation, in such county or magisterial district, and not embraced within the corporate limits of any incorporated town in such counties which maintains its own streets, and is exempt from county and district road taxes, unless the citizens of such town voted on the question of issuing county or district road bonds, sufficient only to provide for the payment of any bonded or other indebtedness and for the interest contracted hereon that may be outstanding as an obligation of any county or district contracted for road purposes or for the sinking fund for the retirement of any bonded indebtedness established for county or district road purposes; * * *

"All balances in the hands of local authorities for county or district road purposes and any taxes heretofore levied for years prior to nineteen hundred and thirty-two

for county or district road purposes and not collected, shall, when collected, and to the extent necessary, be disbursed in payment of obligations heretofore contracted for county or district road purposes and remaining unpaid, and the balance, if any, for general county or district purposes."

■ All of the provisions of this section are to be read together. When this is done we see that there is no conflict. A special local levy must be made when necessary, but not before.

In section 6 provision is made for the disposition of road machinery, etc., owned by the local road authorities. From that source "Any sums received by the local road authorities under the provisions of this section shall, so far as may be necessary, be applied on account of obligations heretofore contracted for county or district road purposes and the balance, if any, for general county purposes."

At the close of the fiscal year, ending June 30, 1932, there was on hand to the credit of the five magisterial districts of the county road funds in the sum of $25,290.32, which fund was thus set up in the treasurer's book:

| | |
|---|---:|
| Cypress District Road Fund | $ 7,429.90 |
| Whaleyville District Road Fund | 5,918.52 |
| Holy Neck District Road Fund | 8,330.03 |
| Chuckatuck District Road Fund | 3,073.88 |
| Sleepy Hole District Road Fund | 537.99 |
| | $25,290.32 |

This balance came from three sources—from gasoline tax, contributed by the State, from district road levies levied upon several magisterial districts of the county, and from the sale of road equipment.

On July 1, 1931, there was a balance to the credit of the district road fund of $20,612.33. On June 1, 1932, the item of $25,290.32 was transferred to what is known as

the Unexpended Road Balance Fund, and so held. Before July 1, 1931, there had been received from road equipment $2,110.53. After that date there was received from that source $1,495.11, of which $37.50 came from the sale of road equipment belonging to Sleepy Hole Magisterial District. The total road fund in hand was $26,785.54. Of this $575.46 stood to the credit of Sleepy Hole Magisterial District. The remainder, the sum of $26,210.08, the amount in controversy, is the total of the balances of district road funds to the credit of Cypress Magisterial District, Whaleyville Magisterial District, Holy Neck Magisterial District, and Chuckatuck Magisterial District. On August 15, 1932, the treasurer of Nansemond county, pursuant to the provisions of the budget, paid semi-annual interest, amounting to $2,619.03, on these bonds out of this Unexpended Road Balance Fund, leaving in it the sum of $24,166.51.

Some disposition had to be made of this composite fund. When assembled it was intended to be used by the county on county roads, but Nansemond county had elected to operate under the Byrd Road Law and so had been relieved of the burden of their maintenance.

The legislature undertook to start afresh, and so it is said that these balances on hand and receipts from taxes levied prior to the year 1932 for county and district road purposes, when collected, should be used in payment of obligations theretofore contracted for county or district road purposes. Of course, it did not relieve Sleepy Hole Magisterial District from its primary obligation, and that district must meet all charges so incurred which it may hereafter have to meet. That is to say, when these unexpended road balances have been exhausted the board will make such special levies in that district as may be necessary to discharge its obligation, but they will not make them until it is necessary.

It may be said in passing that we are not concerned with what went on before 1932. It is enough to say that interest had been paid, that proper provision had been

made for the establishment of a sinking fund and that the bondholders are not complaining.

■ The wide power of the State over its highways is universally recognized.

In *Ferguson* v. *Board of Supervisors*, 133 Va. 561, 113 S. E. 860, 861, Judge Prentis said: "It is also true, as a general proposition, that, subject only to constitutional limitation, the legislature has supreme control over streets and highways (*Norfolk, etc., Co.* v. *Norfolk*, 115 Va. 177, 78 S. E. 545, Ann. Cas. 1914D, 1067), while Constitution, section 65, in terms provides that, 'The General Assembly may, by general laws, confer upon the boards of supervisors of the counties and the councils of cities and towns, such powers of local and special legislation, as it may from time to time deem expedient, not inconsistent with the limitations contained in this Constitution.' *Polglaise's Case*, 114 Va. 850, 76 S. E. 897; *Standard Oil Co.* v. *Commonwealth*, 131 Va. 830, 109 S. E. 316."

This power of the State over county roads was for a long time seldom exercised. Counties built and maintained them, but it was a wasteful system and unsuited to modern conditions. In 1906 (Acts 1906, ch. 73, p. 71) a State Highway Commissioner was appointed who was given general supervision over their construction and maintenance. In 1918 (Acts 1918, ch. 10, p. 9) provision was made for a State highway system, which system included most of our main traveled roads. Secondary roads were not, however, taken in, but remained under local authorities. This situation was continued until the passage of the act of 1932, when they also were taken over by the State; and so, by progressive legislation, counties have been entirely relieved of this major drain upon their resources.

■ Our legislature functions under no grant of power. It may do those things which are not forbidden (*Quesinberry* v. *Hull*, 159 Va. 270, 165 S. E. 382), and, of course, statutes are not to be declared unconstitutional until that has been made plainly to appear.

■ If the legislature had power to do those things which the Byrd Road Law authorizes, that ends this case. If the county had authority to dispose of this unexpended road balance, independent of the act of 1932, that also ends it.

It is made up, as we have seen, from receipts of the sale of road machinery, from ordinary district road levies and from a part of the gasoline sales tax given to the county by the State. This gasoline tax is given to the counties and not to the districts. The board of supervisors, as a matter of equity and of convenience, parceled it out among them. In it they had no vested right. The board had the power to spend this entire fund on one project, and but for this gift from the Commonwealth there would have been no balance at all. In the year 1931-32 there was paid over $35,901.42. It does not belong to the township, and if the county cannot use it for county purposes it cannot be used at all, and so might possibly be recaptured by the State. No citizen of Nansemond county insists upon that. If the entire fund in controversy had come from ordinary district road levies, the results would be the same. Such a fund would have been properly assembled and would have been properly paid out if paid out for the maintnance of secondary roads. The State might have said to the county, "If you will turn over this money to us, we will do all that you could have done with it. We will maintain your secondary roads and will maintain them not only for the current year, but for all successive years." Plainly the county would have had power to accept so favorable a proposition. As a matter of fact, the more generous course was adopted. The State made no such demand. The county was permitted to keep this balance. To that extent it is better off and the townships are not hurt. Had the county never consented to operate under the provisions of the act of 1932, this money would have been spent on township roads. All that the townships could have asked was that it be so spent and that their roads be kept up. Their roads have been kept

up without added cost and this is all that in any circumstances they could have hoped for.

■ The action of the board may be sustained on another theory. Here we have an unexpended balance from a lawful levy made for a proper purpose, and used until that purpose was accomplished. What must the county do with the residue of the levy? It goes into the general county fund. *Parker* v. *Board of Commissioners,* 178 N. C. 92, 100 S. E. 244.

This is not the ordinary case of taking money raised for one purpose and using it for another. We are merely dealing with an unexpended and unexpected balance remaining after the purposes for which it had been collected are fulfilled. No one contends that a special levy could be put upon Sleepy Hole District to build a bridge in Chuckatuck.

■ Ordinarily budgets are made up for the year immediately at hand and so do not provide for payments to be made beyond it. It would follow from this that payments made on account of interest and sinking fund should have been so limited. In this particular case the statute has authorized application of all these balances to payment of obligations theretofore contracted for county or district road purposes. Authority for complete disposition is written into the statute.

■ Since these petitioners have not prevailed there can be no allowance for counsel fees.

On July 26, 1932, Taylor and other citizens of Sleepy Hole Magisterial District filed their petition praying for a writ of mandamus. They wanted those things done which Godwin and his associates did not want done. They wanted this road balance applied as the trial court afterwards held that it should be applied. But they wanted more. They asked that there be used in the same manner two other sums, one of $7,500 received from the city of Portsmouth for the maintenance, upkeep and replacement of two bridges, and one of $1,283 which came from Southampton county on account of the upkeep of a joint

bridge. The county answered this Taylor petition and Godwin and others were permitted to intervene and answered it also.

We have dealt with the disposition made of the major claim. Relative to these two additional items set up in the Taylor petition, the trial court held that they had been transferred to the general county fund, prior to July 1, 1932, the date at which the statute took effect, and were not as of that date a part of any road balance. In this there was no error.

We find no error in the judgment appealed from. It should be affirmed, and it is so ordered.

*Affirmed.*